10 CV 5644

UNITED STATES DISTRICT COURT
SOUTHERN  DISTRICT OF NEW YORK
-----------------------------------------------------X

MICHAEL SHER AND PAULA SHER,                    Docket No.:
individually and on Behalf of
all others similarly situated,                         :
                                                       :
                              Plaintiffs,              :     **CLASS ACTION COMPLAINT**
                                                       :
          -against-                                    :     Jury Trial Requested
                                                       :
ALLSTATE INSURANCE COMPANY,                            :     RECEIVED
                                                       :     JUL 26 2010
                              Defendant.               :     U.S.D.C. S.D. N.Y.
                                                       :     CASHIERS
-----------------------------------------------------X

     Plaintiffs Michael Sher and Paula Sher, individually and on behalf of all others similarly situated, for their Class action complaint (the "Complaint") allege the following upon personal knowledge of their own acts and circumstances and upon information and belief as to all other matters based upon the investigation of Plaintiffs' attorneys.

## SUMMARY OF ACTION

    1.        This is a Class action on behalf of a Class of all persons/entities who were/are insured by Allstate Insurance Company (hereinafter "Allstate") under policies of property insurance issued on properties located in the state of New York which include replacement cost coverage under either the standard replacement cost coverage terms of the policies offered by Allstate Insurance Company and/or under Allstate's Building Structure Reimbursement Extended Limits Endorsement, insuring against all risks of loss including fire[1] from July 27, 2004 to date ("the "Class Period").

---

[1] Except as may be specifically excluded or limited.

2.          The Class includes all Class members who made covered property damage claims to Allstate but to whom Allstate refused to make payment for full replacement value, specifically the holdback a/k/a "recoverable depreciation," of the damaged property because the insured property was not <u>completely</u> repaired or replaced within a period of 180 days from a date arbitrarily set by Allstate, that being the date of payment of the actual cash value. The Class also includes insureds who paid premiums for extended limits benefits over and above policy limits but to whom Allstate refused to make payment for extended limits because the insured property was not <u>completely</u> repaired or replaced within a period of 180 days from a date arbitrarily set by Allstate. The Class also includes a Sub-Class of Allstate insureds that purchased similar policies but never had losses and are entitled to rescission and premium refunds for the reasons set forth hereinbelow.

3.          The Allstate claims handling and adjustment practices and Allstate's policy interpretation that are the subject of this lawsuit are uniform within New York State. Allstate's policy language with respect to its replacement cost coverage obligations and Allstate's interpretation thereof, violate the insurance law of the State of New York which mandates the use of certain minimum terms and conditions in any property damage policies insuring against the peril of fire and prohibits Allstate from offering coverage "less favorable" than provided under statutorily mandated coverage terms contained in New York's Standard Fire Insurance Policy (commonly referred to in the insurance industry as the "165 lines") (Insurance Law Section 3404). As a matter of practice, during the Class Period, Allstate has invariably refused to pay its insureds the benefits of the replacement cost coverage and/or extended limits for covered losses to covered property when the insured does not complete repair or replacement of the damaged covered property within 180 days of the date when

2.        The Class includes all Class members who made covered property damage claims to Allstate but to whom Allstate refused to make payment for full replacement value, specifically the holdback a/k/a "recoverable depreciation," of the damaged property because the insured property was not <u>completely</u> repaired or replaced within a period of 180 days from a date arbitrarily set by Allstate, that being the date of payment of the actual cash value.  The Class also includes insureds who paid premiums for extended limits benefits over and above policy limits but to whom Allstate refused to make payment for extended limits because the insured property was not <u>completely</u> repaired or replaced within a period of 180 days from a date arbitrarily set by Allstate.  The Class also includes a Sub-Class of Allstate insureds that purchased similar policies but never had losses and are entitled to premium refunds for the reasons set forth hereinbelow.

3.        The Allstate claims handling and adjustment practices and Allstate's policy interpretation that are the subject of this lawsuit are uniform within New York State. Allstate's policy language with respect to its replacement cost coverage obligations and Allstate's interpretation thereof, violate the insurance law of the State of New York which mandates the use of certain minimum terms and conditions in any property damage policies insuring against the peril of fire and prohibits Allstate from offering coverage "less favorable" than provided under statutorily mandated coverage terms contained in New York's Standard Fire Insurance Policy (commonly referred to in the insurance industry as the "165 lines") (Insurance Law Section 3404).  As a matter of practice, during the Class Period, Allstate has invariably refused to pay its insureds the benefits of the replacement cost coverage and/or extended limits for covered losses to covered property when the insured does not complete repair or replacement of the damaged covered property within 180 days of the date when

Allstate sends the insured a check in payment for the Actual Cash Value (ACV) of the damaged property notwithstanding that such amount is substantially below the replacement cost coverage paid for by the insured.  Allstate has invariably asserted a similar position when claim is made for extended limits benefits.

4.         Allstate has interpreted its homeowner property policies to require the insured to complete all repairs and replacement of damaged property within an arbitrary 180 day period set by Allstate as a condition precedent to obtaining the benefits of (1) the replacement value on both building and contents claims coverage subjecting the insureds to the loss of recoverable depreciation (for which the insured has paid an additional premium); and/or (2) the Building Structure Reimbursement (AP693) which provides 125% of the policy limit if the repair or replacement costs exceed policy limits.

5.         Accordingly, Allstate's homeowner's insurance policies, Allstate's interpretation thereof, and adjustment of losses under the property damage policies it has issued in the state of New York are in violation of New York state insurance law.

6.         The Class members seek to recover the amount of the repair and replacement cost holdback which Allstate has refused to pay on both building and contents claims as well as the amounts owed based upon the extended limits endorsements and all other damages flowing therefrom as more fully set forth herein.

7.         The Class also seeks to rescind the policies of insurance sold by Allstate which purportedly included replacement cost coverage (either as part of the standard Allstate policy form or as an endorsement for which a separate premium was charged) and obtain a return of premiums paid by Class members to Allstate on the grounds that Allstate never intended to make available to its insureds and in fact Allstate's practice has been to deny the

replacement cost coverage benefit and/or extended limits benefits (as expressly provided by policy language and New York state insurance law) to its insureds who have suffered covered losses.

## JURISDICTION AND VENUE

8.        This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1332(a) and the Class Action Fairness Act of 2005, 28 U.S.C. 1332(d).  The matter in controversy exceeds the sums specified by 28 U.S.C. 1332, exclusive of interest and costs.  The citizenship of plaintiff and the defendant is set forth below.

9.        The action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. 1332(d)(4)(A) and (B).

10.        This action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. 1332(d)(3).

11.        Venue is proper in this district pursuant to 28 U.S.C. 1391(b) because many of the acts, transactions and conduct constituting violations of law complained of in this Complaint occurred in this District and Defendant is subject to personal jurisdiction in this District.

## THE PARTIES

12.        Plaintiffs Michael Sher and Paul Sher were and are insureds of Allstate who have been paying premiums for replacement coverage that Allstate never intended to provide to them in the event of a covered loss and who have not been paid full replacement and repair cost for their insured loss as provided by the policy of insurance they purchased from Allstate and as required by New York state law.

4

13.      Defendant Allstate Insurance Company, through its agents, sells property insurance to insureds in the state of New York for properties located in the state of New York and is an Illinois corporation with its principal executive offices located at 2775 Sanders Road, Northbrook, Illinois 60062.

## CLASS ACTION ALLEGATIONS

14.      Plaintiffs sue on their own behalf and on behalf of the Class previously defined herein at paragraph 2.

15.      The persons in the Class are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, Plaintiffs are informed and believes that there are thousands of Class members.

The Class

16.      There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including:

(a)      whether the express terms and conditions in the policies sold by Allstate during the Class Period for property damage coverage violate New York Insurance Law;

(b)      whether the express terms and conditions in the policies sold by Allstate during the Class Period for property damage coverage violate the expressed wishes and demands of the New York State Insurance  Department who is charged with responsibility for approving such policies;

(c)      whether Allstate replacement cost coverage and/or extended policy limits terms are less favorable to insureds than the Standard Fire Insurance Policy mandated by New York Insurance Law;

(d)        whether Allstate's refusal to pay insureds the full benefits of the replacement cost coverage and/or the extended limits under the policies violates New York Insurance Law;

(e)        whether Allstate's practices for the interpretation of its policy terms and/or Allstate's adjustment loss practices violate New York Insurance Law;

(f)        whether Allstate's refusal to pay insureds the full benefits of the replacement cost coverage and/or the extended limits under the policies due to an insured's failure to complete repairs within 180 days of the date the Company pays ACV violates the express terms of the policies which do not expressly require completion of repair or replacement within that period of time;

(g)        whether Allstate's advertising and marketing practices for its homeowner's property damage policies in the State of New York are materially false and misleading;

(h)        whether the relevant terms and conditions of the policies issued to Class members were and are i) drafted by Allstate; ii) ambiguous; iii) reasonably interpreted in a manner consistent with Plaintiffs' interpretation;

(i)        whether Allstate's practices constitute a fraud insofar as Allstate markets and sells policies in which it promises to afford coverage despite the fact that Allstate knows it will not allow the policyholder to realize the benefits of the coverage;

(j)        whether Plaintiffs and the other Class members have been damaged by Defendant's conduct;

(k)        the amount of damages suffered by Plaintiffs and the Class; and

(l)         whether the policies sold to class members by Allstate which purport to provide replacement cost coverage and extended benefits can be rescinded and premiums for the entire policy returned to the policyholders on the grounds that Allstate's replacement cost coverage was illusory and of no value to Class Members for the reasons set forth herein.

17.        The claims of the plaintiffs are typical of the claims of the Class because Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as the claims of the Class.

18.        The representative plaintiffs will fairly and adequately protect the interests of the Class.

19.        A Class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## SUBSTANTIVE ALLEGATIONS

**A.     The Practices Engaged In By Allstate As Alleged Herein Were Developed On The Advice of McKinsey & Co. To Allow Allstate To Wring Windfall Profits From Insureds By Denying Insureds The Full Benefits Of Coverage Sold to Class Members And Insureds Throughout New York and The United States**

20.        Sometime before September 1, 1992, Allstate's senior executives approached McKinsey & Company ("McKinsey"), an international business consulting firm, to consult about ways to improve its earnings and profits.  McKinsey and Allstate focused on claims-paying.  McKinsey and Allstate designed a new claim system, called "Claims Core Process Redesign", or "CCPR."  McKinsey told Allstate that CCPR would be designed to treat paying claims like a "zero-sum economic game.  Allstate gains – others must lose."  CCPR and

other claims handling protocols at issue in this case were implemented and are applied uniformly by Allstate to all its insureds.

21.     At the same time, McKinsey recommended that Allstate redefine its coverage and loss adjustment practices to restrict coverage and pay less money on legitimate claims.  In a slide presentation disseminated within Allstate, Allstate admits that one of its strategies for "winning the economic game" is "—Redefinition of claims benefits and payment approach."  In McKinsey's own words, "[C]urrent processes are incenting and reinforcing behavior that does not reward shareholders." (emphasis added)

22.     Allstate's new practices for handling claims made by its own insureds are exactly the same, in concept, as those for handling claims of third-parties who sue Allstate's insureds.  In other words, Allstate treats its own policyholders the same as it treats non-policyholders who sue Allstate's insureds.

23.     McKinsey applied its new business model to all claims of all Allstate insureds that made claims for property damage in all states.

24.     In a July 1995 McKinsey slide entitled "Allstate Personal Lines – CCPR Benefit Projections," McKinsey projected that applying CCPR's model to homeowners' claims (such as claims of the plaintiffs and Class members) would reduce Allstate's homeowner claim payments by as much as $400 million between 1996 and 1999.

25.     The contrast between Allstate's reported financial results pre-implementation of McKinsey recommendations compared to post-implementation demonstrates Allstate's use of these methods and their effectiveness in driving profits higher at the expense of insureds.  Allstate paid out 73% of premium in benefits from 1987 to 1996 when

the overall industry average was 70% of the premium dollar. Yet, during this same period, Allstate's net profits were at least as good as, if not better than, the industry average.

26.      After Allstate had ramped up its implementation in 1996, Allstate's implementation of McKinsey's recommendations yielded immediate windfall profits for Allstate. Its premium payout ratio dropped to a startlingly low 59% from 1997 to 2005, a decline of 19.2% of the loss payout ratio.

27.      Not surprisingly, in 2006, Allstate posted a $5 billion post-tax operating and investment profit. That was a record for Allstate as Allstate's insurance companies paid out a record-low 47.6¢ per premium dollar for claims during 2006.

**B.      Allstate Misled The New York State Insurance Department And Inserted Language In Its Form Of Property Damage Policies Sold In New York During The Class Period Without Identifying the Differences From its Prior Form as Required.  Allstate's Interpretation was Never Disclosed to <u>The New York State Insurance Department for Approval by It.</u>**

28.      In the 1990s, Allstate began to introduce changes to its property damage policies in the state of New York and elsewhere. Upon information and belief, based on investigation of counsel, the changes in the language of Allstate's property insurance coverage in New York was implemented as part of Allstate's overhaul of its business model as advised by McKinsey & Co. as described above.

29.      Originally, Allstate's policy terms for property damage coverage in New York allowed the insured to qualify for the benefits of the replacement cost coverage under the policy by simply making claim therefore within 180 days of the date of loss. The pertinent policy language in the Allstate policies (pre-McKinsey) provided as follows:

> If you decide not to repair or replace the damage property, settlement will be on an actual cash value basis, not to exceed the limit of liability applicable to the building.  You may make claim within 180 days after the date of the loss for any additional payment on a replacement cost basis if you repair the damaged property.

Under this provision the insureds needed only to "make claim" for the additional replacement cost coverage (or the depreciation "Holdback") within 180 days of the date of loss.  The insured was not obligated to have actually completed (or started) the work by an arbitrary deadline as a condition of receiving the replacement cost coverage benefits or Holdback once repairs were concluded.

30.     In the 1990s, Allstate devised revised policy terms for policies issued in New York and other states, which Allstate has asserted allows it to restrict the replacement cost and/or extended limits coverage and to adjust losses so as to withhold monies due insureds and impose conditions on insureds for payment of replacement cost proceeds (or the holdback) and/or extended limits coverage on covered claims.

31.     In the 1990s, Allstate representatives approached the New York State Insurance Department to obtain approval of new language governing the replacement cost coverage and the Holdback under the property damage policies sold in New York State.  The new policy language proposed to the New York State Insurance Department reads as follows:

> b)     Actual Cash Value.  This means there may be a deduction for depreciation.
>
> If you do not to repair or replace the damage building structure, payment will be on an actual cash value basis, not to exceed the limit of liability shown on the declarations page for Coverage A – Dwelling Protection.  You may make claim for additional payment as described in paragraph (c) [of the Policy] and paragraph (d) [of the Policy], **if you repair or replace the damaged, destroyed, or stolen covered property within 180 days of the actual cash value payment.**  (emphasis added)

10

32.          According to Confidential Witness No. 1 (an official within the New York State Department of Insurance, who was an Insurance Department employee at the relevant time) the Insurance Department never knowingly approved the language proposed by Allstate. (See Exhibit "A") Differences with the prior form were not disclosed as required and Allstate never stated its intent to interpret the new language as requiring insureds to "complete" repair, rebuild or replacement within 180 days.

33.          Allstate proceeded to market and issue property damage policies in New York that contained the new policy language. Accordingly, since that date Allstate has been issuing policies within the state of New York that have not been properly approved, as required, under New York State insurance law by the New York State Insurance Department.

34.          In marketing its property damage policies in the state of New York, Allstate intentionally obscured and concealed the restrictions it imposed upon the insured to obtain benefits of the replacement cost coverage and/or holdback proceeds and/or extended limits benefits in the event of a covered loss to covered property. Attached hereto as Exhibit "B" is a copy of internet and print marketing materials typically used by Allstate during the relevant period which describes the replacement cost basic coverage and extended limits replacement cost coverage very prominently but misleadingly omits any references to the coverage restrictions imposed by Allstate as a condition of the insured's realizing those benefits, *i.e.* the Allstate –imposed requirement that the insured complete repairs and replacement of damaged property within 180 days of an arbitrary date selected by Allstate to pay the Actual Cash Value of a covered loss for covered property.

35.          The new policy language (described in paragraph 31 above) has been interpreted by Allstate to require that the Plaintiffs and other Class members COMPLETE all

11

repairs and/or replacement of all damaged property within 180 days of Allstate's payment of the Actual Cash Value loss, as opposed to the prior language which required that Plaintiffs needed only to make a claim for the Replacement Cost coverage within the 180 days from the date of loss and did not even require the insured to begin repairs within that time period in order to enable subsequent payment of the holdback and/or Replacement Cost coverage. Allstate's refusal to pay replacement cost benefits or the holdback and/or extended limits benefits unless the repairs and replacement were COMPLETED within 180 days is itself a breach of the new language even if the new language had been knowingly approved by the Insurance Department.

36.     The new language does not require "completion" of repair, rebuild or replacement in order to qualify for subsequent payment of the holdback or extended benefits.

37.     The new language is at worst, ambiguous as to whether repair, replacement or rebuilding must be merely undertaken within 180 days or actually "completed" within 180 days as interpreted by Allstate.

38.     Upon information and belief, after Allstate changed (without the Insurance Department's knowing approval) the terms of the property damage policies in New York in the 1990s, it began to impose the new condition upon insureds which required the insureds to "complete" the repair or replacement of the damaged property within 180 days of the actual cash value payment as a condition for qualifying for the full replacement value under the policy.

39.     Allstate has imposed this extra-contractual condition intentionally and uniformly to justify coverage restrictions and under-payment of claims as part of its

implementation of McKinsey's recommendation to Allstate to "… redefine claims benefits and payment approach".

40.     Allstate knows it is nearly impossible for Plaintiffs and other Class members to comply with Allstate's interpretation of its coverage and complete repairs within 180 days of the date arbitrarily set by Allstate.  Insureds are often at the mercy of the weather, building departments, contractors, architects and inspectors for municipalities, mortgagees and the normal time for major reconstruction, all of which are beyond the control of the Plaintiffs and Class members.  On large losses, such as Plaintiffs', due to the size and scope of the damage and necessary demolition and repairs or construction, replacement is physically impossible to start and complete within 180 days of the date that Allstate picks to make the actual cash value payments that the insureds desperately need to hire an architect to draw and file plans, obtain permits and for a contractor to demolish damaged areas and start on the work.

41.     As part of its McKinsey-inspired effort to "redefine claims benefits and payment approach," Allstate also applied the same impermissible 180 day completion condition on Class members who were induced to purchase, at a separate charge, an extended limits endorsement.  Such coverage, by its terms, affords the insured 125% of the policy limit if the cost to repair or replace exceeds policy limits.  With respect to this coverage supplement, Allstate has also written and interpreted its policy language to require complete repair or replacement within 180 days of a date arbitrarily set by Allstate despite the fact that this provision does not require "completion."

42.     Since it is often impossible for insureds to repair or replace seriously damaged real property within 180 days of receiving the Actual Cash Value payment, insureds often are not allowed to collect on these benefits afforded in Allstate's policies.  Allstate's

interpretation of its policy language and its practices with respect to the adjustment and

payment of losses has allowed Defendant to retain insurance coverage proceeds under policy

coverages purchased by insureds.

      **C.**    **Allstate's Policy Form That Included The 180 Day Limit**
             **Is In Contravention Of New York Insurance Law Section 3404, "Fire**
             **Insurance Contracts; Standard Policy Provisions; Permissible Variations"**
             **And Also Violates The Contractual Undertaking In Allstate's Policies**
             **That The Policy Terms And Conditions Are Automatically Conformed To**
             **To State Laws As Applicable**

43.        Allstate uses standard forms throughout New York State for insuring

dwellings and other structures against loss by fire and other perils and did so also at all relevant

times during the Class Period.

44.        While Allstate purports to be interpreting the pertinent policy language

according to its written terms and conditions, that interpretation and the policy language itself

violate New York Insurance Law Section 3404 and similar laws of other states which prohibit

the sale of policies if the policies' terms are less favorable to the insured than the terms of the

"Standard Fire Insurance Policy of the state of New York" as set forth (in New York) in Article

34, Section 3404, Chapter 28 McKinney's Consolidated Law of New York Annotated.

45.        New York Insurance Law Section 3404, "Contracts-Property And

Casualty, Fire Insurance Contracts; Standard Policy Provisions; Permissible Variations,"

provides, in pertinent part as follows:

> (a)    The printed form of a policy of fire insurance, as set forth
> in subsection (e) hereof, shall be known and designated as the
> "standard fire insurance policy of the state of New York."
>
> (b)(1)  No policy or contract of fire insurance shall be made,
> issued or delivered by any insurer or by any agent or
> representative thereof, on any property in this state, unless it shall
> conform as to all provisions, stipulations, agreements and
> conditions with such form of policy, except policies subject to the

provisions of section three thousand one hundred two of this chapter which shall be required to comply with the provisions of paragraph one of subsection (f) of this section.

        \*                \*                \*

(c)     The form of the standard fire insurance policy of the State of New York (with permission to substitute for the word "company," a more accurate descriptive term for the type of insurer) shall be as follows:

"In consideration of the provisions and Stipulations herein or added hereto and of _____ Dollars premiums this company for the term from the _____ day of _____, 19___ to the _____ day of _____, 19__, does insure _____ and legal representatives **TO THE LESSER AMOUNT OF EITHER**:

1) **THE ACTUAL CASH VALUE OF THE PROPERTY AT THE TIME OF THE LOSS, OR**

2) **THE AMOUNT OF WHICH IT WOULD COST TO REPAIR OR REPLACE THE PROPERTY WITH MATERIAL OF LIKE KINDAND QUALITY WITHIN A REASONALBE TIME AFTER SUCH LOSS,** WITHOUT ALLOWANCE FOR ANY INCREASED COST OF REPAIR OR RECONSTRUCTION BY REASON OF ANY ORDINANCE OR LAW REGULATING CONSTRUCTION OR REPAIR, AND WITHOUT COMPENSATION FOR LOSS RESULTING FROM INTERRUPTION OF BUSINESS OR MANUFACTURE, OR (bold emphasis added)

3) TO AN AMOUNT NOT EXCEEDING _____ DOLLARS, BUT IN ANY EVENT FOR NO MORE THAN THE INTEREST OF THE INSURED, AGAINST ALL DIRECT LOSS BY FIRE, LIGHTNING AND BY REMOVAL FROM PREMISES ENDANGERED BY THE PERILS INSURED AGAINST IN THIS POLICY, EXCEPT AS HEREINAFTER PROVIDED, to the property described hereinafter while located or contained as described in this policy, or pro rata for five days at each proper place to which any of the property shall necessarily be removed for preservation from the perils insured against in this policy, but not elsewhere.

\*                    \*                    \*

(f)(1)   Subject to the approval of the superintendent, a policy which insures solely against the peril of fire or which insures against the perils of fire in combination with other kinds of insurance either for divisible or indivisible premium need not comply with the provision of subsection (e) of this section provided:

    (A)   The policy contains, with respect to the perils of fire, terms and provisions no less favorable to the insured than those contained in the standard fire policy;

\*                    \*                    \*

It shall be optional with this Company to take all, or any part, of the property at the agreed or appraised value, and also to repair, rebuild or, replace the property destroyed or damaged with other of like kind and quality within a reasonable time, on giving notice of its intention so to do within thirty days after the receipt of the proof of loss herein required.

\*                    \*                    \*

When Loss Payable:
The amount of loss for which the Company may be liable shall be payable sixty days after proof of loss, as herein provided, is received by this Company and ascertainment of the loss is made either by agreement between the insured and this Company expressed in writing or by the filing with this Company of an award as herein provided.

\*                    \*                    \*

46.       The coverage provided by the foregoing terms of Insurance Law §3404 and the 165 lines is more extensive and favorable to the insured that the coverage provided by Allstate's standard property damage coverage forms in that it allows a "reasonable time" to repair, rebuild or replace damaged property.  Allstate's policy terms and its practices with respect to Allstate's policy terms and conditions and its interpretation thereof and adjustment

and loss paying practices for policies of insurance issued in the state of New York thus afford to insureds "less favorable coverage" than offered under New York's Standard Fire Insurance Policy and thus violate New York Insurance Law which requires all such coverage in New York to be offered to afford no less favorable coverage than offered under the Standard Fire Insurance Policy.

47.     One of Allstate's most common standard forms of insurance coverage for property damage coverage is the "Allstate Deluxe Plus Policy AP 317." (Certified copy of the policy annexed as Exhibit "C".

48.     Under the terms of the Deluxe Plus Policy, Allstate covers "dwellings" and "attached structures", *inter alia*, ("Covered Property") against "sudden and accidental direct physical loss" with specified exceptions.

49.     The Deluxe Plus Policy also sets forth the terms of "How We Pay For A Loss":

> b)     Actual Cash Value
> If you do not repair or replace the damaged, destroyed or stolen property, payment will be on an actual cash value basis. This means there may be a deduction for depreciation.  Payment will not exceed the limit of liability shown on the Policy Declarations for the coverage that applies to the damaged, destroyed or stolen property, regardless of the number of items involved in the loss.
>
> **You may make claim for additional payment as described in paragraph c, and paragraph d if applicable, if you repair or replace the damaged, destroyed or stolen covered property within 180 days of the actual cash value payment. (bold emphasis added)**
>
> c)     Building Structure Reimbursement
> Under Coverage A – Dwelling Protection and Coverage B – Other Structures Protection, **we will make additional payment to reimburse you for cost in excess of actual cash value if <u>you</u> repair, rebuild or replace damages, destroyed or stolen covered property within 180 days of the actual cash value**

17

**payment.  This additional payment includes the reasonable and necessary expense for treatment or removal and disposal of contaminates, toxins or pollutants as required to complete repair or replacement of that part of a <u>building structure(s)</u> damaged by a covered loss. (bold emphasis added)**

Building Structure Reimbursement will not exceed the smallest of the following amounts:

1) the replacement cost of the part(s) of the building structure(s) for like kind and quality construction, for similar use, on the same premises;

2) the amount actually and necessarily spent to repair or replace the damages building structure(s) with like kind and quality construction, for similar use, on the same premises; or

3) the limit of liability applicable to the building structure(s) as shown on the Policy Declarations for Coverage A – Dwelling Protection or Coverage B - Other Structures Protection, regardless of the number of building structures and structures other than building structures involved in the loss.

Building Structure Reimbursement payment will be limited to the difference between any actual cash value payment made for the covered loss to building structures and the smallest of 1), 2) or 3) above.

d) Personal Property Reimbursement - Under Coverage C – Personal Property Protection, **we will make additional payment to reimburse you for cost in excess of actual cash value if you repair, rebuild or replace damaged, destroyed or stolen covered personal property or wall-to-wall carpeting within 180 days of the actual cash value payment.  (Bold emphasis added)**

Personal Property Reimbursement payment will not exceed the smallest of the following amounts:

1) the amount actually and necessarily spent to repair or replace the property with similar property of like kind and quality.

2) the cost of repair or restoration.

3) the limit of liability shown on the Policy Declarations for Coverage C – Personal Property Protection, or any special limit of liability described in the policy, regardless of the number of items of personal property involved in the loss.

Personal Property Reimbursement will be limited to the
difference between any actual cash value payment made for the
covered loss to personal property and the smallest of 1), 2) or 3)
above. Exhibit C, p. 18-19)

50.          The Deluxe Plus Policy also provides "Our Settlement Of Loss":

Our Settlement Of Loss

We will settle any covered loss with you unless another payee is
named in the policy.  We will settle within 60 days after the
amount of loss is finally determined.  This amount may be
determined by an agreement between you and us, an appraisal
award, or a court judgment. (Exhibit "C", p.20)

51.          Allstate's Deluxe Plus Policy includes Building Structure Extended

Reimbursement coverage that purportedly provides the insured with coverage for the amount it

costs to repair or replace the damaged insured property up to 125% of the stated policy limits.

This coverage assures the insured the property owner the that he/she will be provided the full

funds necessary to repair and replace damaged property regardless of policy limit, up to 125%

of that limit.  Such coverage is more expensive to the insured than the coverage without this

benefit.  Such coverage is also subject to Allstate's 180 day language and erroneous

interpretation.

52.          The Deluxe Plus Policy and Allstate's other policy forms also provides

for "Conformity to State Statutes" as follows:

Conformity to State Statutes

When the policy provisions conflict with the statutes of the state
in which the residence premise is located, the provisions are
amended to conform to such statutes. (Exhibit "C" p. 4)

53.          The Deluxe Plus policy and other Allstate policy forms state:

"Our Settlement Options
In the event of a covered loss, **we** have the option to
a) repair, rebuild or replace all or any part of the damaged,

19

destroyed or stolen property with property of like kind and quality
**within a reasonable time**; or
b) pay for all or any part of the damaged destroyed or stolen property
as described in Condition 6 "How We Pay For a Loss."  (Exhibit C, p. 18)
(emphasis added)

54.        In the 165 lines there is no language which requires completion of the

repairs within 180 days and, in fact, it mandates and measures payment within "a reasonable

time after such loss" and is "payable sixty days after proof of loss, as herein provided, is

received by this company and ascertainment of the loss is made either by agreement between

the insured and this Company expressed in writing or by the filing with this Company of an

award as herein provided."  Allstate's inclusion of such policy language renders the policy's

terms and conditions less favorable to the insured than the 165 lines and therefore violates the

"no less favorable" prohibition of the Insurance Law and violates its own policy language

which falsely assures the Class members that Allstate's coverage will be conformed to

applicable state law even if such law requires broader coverage than the language of the policy

or of Allstate's own internal loss adjustment and policy interpretation practices. Moreover,

Allstate's loss adjustment practices and its pattern and practice of adjusting losses to require

COMPLETE repair and replacement of all covered damaged property before the insured can

qualify for benefits of the replacement cost coverage and/or extended limits benefits renders the

coverage afforded by Allstate less favorable to the insured than the 165 lines which permits

recovery under certain circumstances of the cost to repair or replace "within a reasonable time

of the loss." (Ins. Law 3404).

55.        Allstate's refusal to pay replacement coverage benefits and/or the

extended limits benefits constitutes a breach of the policy terms and conditions.

56.          Allstate's use of the 180 day policy terms was never knowingly approved by the New York State Insurance Department and accordingly Allstate's sale and marketing of policies including those terms is in violation of New York law. Accordingly, all of Allstate's property damage polices in New York can and should have been marketed and/or interpreted only with the original 180 day language described at paragraph 29.

57.          Other language changes included by Allstate at the same time the 180 day language was added have already been judicially determined as violating Insurance Law 3404, as affording less favorable coverage.

**D.     In 2009, Allstate Once Again Tried And Failed to Get
The New York Insurance Department To Approve Policy
Language That Restricted Coverage In Contravention Of
The 165 Lines Statutory Requirements**

58.          In 2009, upon the New York Insurance Department's realization of such unauthorized use of said language, Allstate was told that its 180 day language was unacceptable. Allstate representatives tried to get the Insurance Department's approval to extend the 180 day repair/replace completion limit to 365 days in order to deflect the onslaught of consumer complaints over its policy language and loss adjustment practices in New York.

59.          As reflected in protracted correspondence between Allstate and the Insurance Department attached hereto as Exhibit "A," the Insurance Department denied Allstate's request for approval of even 365 day language

60.          The Insurance Department has recently directed that new policies issued as of September 2010, allow at least two years for the insured to Repair, Rebuild or Replace.

61.          Moreover, the Insurance Department challenged the use by Allstate of such limitations period for completion of repair of replacement as a condition of an insureds obtaining the repair or replacement and/or Holdback coverage afforded under the polices.

62.        In explicit correspondence, the Insurance Department castigated Allstate

for unreasonably restricting the coverage and asked Allstate repeatedly to explain the basis for

its policy language interpretation requiring the insured to COMPLETE repair or replacement

before being allowed to qualify for collect additional policy proceeds provided under the

policy, pointing out that Allstate is the only insurer in the market that uses said unauthorized

language.

63.        Rather than explain its rationale or provide evidence of any prior

Department approval for its interpretation of the 180 day language, Allstate withdrew its

request for a policy language change.  (See Exhibit "A"). But Allstate has not withdrawn its

180 day repair/replace language from the policies it issues in New York continues to adjust

losses so as to require COMPLETE repair or replacement of the damaged property within 180

days from Actual Cash Value payment as a condition for an insured to qualify for the

replacement cost benefits and extended limits endorsement benefits.

64.        As a result of Allstate's pattern and practice of (i) marketing polices not

knowingly approved by the Insurance Department of the State of New York; (ii) marketing

policies with coverage "less favorable to the insured" than the 165 lines; (iii) breaching its

obligations under the policies by failing to conform its policy language to applicable statutes in

New York, including the 165 lines; (iv) breaching its obligations under the policies by

requiring the insured to COMPLETE repairs or replacement in order to qualify for the benefits

of the replacement cost coverage and/or the extended limits endorsement; (v) breaching their

obligations under the polices by adjusting losses in a manner deliberately calculated to justify

depriving the insured of the benefits of the replacement cost coverage and/or the extended

limits endorsement, plaintiffs and Class members have been deprived and cheated of hundreds

of millions of dollars of coverage which they paid for and which was part of the property damage coverage marketed and sold by Allstate to plaintiffs and Class members.

      **E.**    **Allstate's Policies Are Contracts Of Adhesion**

      65.      Plaintiffs and the Class were unable to negotiate or opt into or out of the terms and conditions of the policies at issue herein.

      66.      The relevant terms and conditions of the polices at issue herein were drafted by Allstate and not knowingly approved by the State of New York Insurance Department.

      67.      Allstate's policy and practice is to refuse to allow its agents to provide to prospective purchasers with copies of its polices where they would learn the precise terms and conditions of the coverage they are seeking to purchase.

      68.      Allstate does not send a copy of the policy of insurance to the insured until well after the insured has paid the premiums.  Marketing materials, tracts, brochures, websites and correspondence marketing the policies are silent as to the 180 day requirements, or claim the coverage is equivalent to or better than Allstate's competitors. Plaintiffs and the Class did not therefore have an opportunity to review the policy terms before purchase. By the time that plaintiffs and the Class received the policy, if they had wanted to cancel it would have cost them money.

      **F.**    **Defendant Allstate Breached The Contracts of Insurance With The Plaintiffs and Class Members in A Pattern and Practice of Imposing Illegal Restrictions Upon its New York Insureds**

      69.      Plaintiffs suffered an insured fire loss on July 27, 2008 to their insured real and personal property in Dix Hills, New York.  Allstate paid a portion of the claim but refused to honor its replacement cost coverage and the extended limits benefits because the

insureds could not complete repair or replacement of the damaged property within the replacement period of 180 days. The construction could not be completed within the replacement period of 180 days as it reasonably took months to select a contractor and architect, draw plans, demolish and remove debris, obtain permits and to complete reconstruction of a large house. Allstate refused to pay approximately $242,000 in insurance proceeds to the insured as a result despite the fact that the house was thereafter completed and contents replaced.

70.     Confidential Allstate Insured No 1. suffered an insured fire loss to her insured real and personal property in Mount Vernon, New York. Allstate paid a portion of the claim but refused to honor its 25% extended limits endorsement because, despite the fact that the insured hired a contractor and made a claim for replacement cost within the replacement period of 180 days, the repair or replacement could not be completed within 180 days because the Mount Vernon Building Department and Architectural Review Board did not issue permits necessary for the work to begin within the 180 days replacement period. Allstate never mentioned this 180 day deadline as to the extended limits endorsement in its correspondence until the deadline ran. Allstate refused the insured's request for an extension and withheld over $80,000.00 in insurance proceeds from the insured. The insured who was of modest means had to borrow funds in a similar amount to continue reconstruction.

71.     Confidential Allstate Insured No 2. suffered an insured fire loss on November 13, 2005 to his insured real and personal property in Muncie, New York. Allstate paid a portion of the claim but refused to honor its replacement cost coverage because the insured could not complete the repair of the building within the replacement period of 180 days. The insured had hired a contractor and was committed to reconstruction of the damaged

premises but the contractor could not obtain all necessary permits, variances and certification of building plans within the replacement period. The insured was required to demolish the damage premises prior to reconstruction due to the extent of damage prolonging the time of construction. Allstate refused the insured's request for an extension of the replacement period and refused to pay replacement cost proceeds to the insured.

72.         Confidential Allstate Insured No. 3 suffered an insured loss in Staten Island, New York. Allstate paid a portion of the loss but refused to pay the replacement cost funds because the insured could not repair or replace the damaged property within the replacement period of 180 days. The insured was unable to complete replacement and repair of the damaged property within 180 days due to Allstate's underpayment of the building loss requiring the insured to use payments for damaged personal property to complete reconstruction delaying or preventing replacement of clothing and other items of damaged personal property belonging to the insured, his wife and eight children.

73.         Confidential Allstate Insured No 4. suffered an insured fire loss to their insured real and personal property in Irvington, New York. Allstate paid a portion of the claim but refused to honor its replacement cost coverage because the insured could not repair or replace the damaged property within the replacement period of 180 days because the Irvington Building Department engaged in a lengthy inspection and approval period, the town wanted the house demolished and required a total reconstruction due to the extent of damage. The application went before two committees and required months for approval. Allstate refused to pay $10,904.69 in insurance proceeds to the insureds as a result. The insured also incurred legal fees and other consequential damages as a result.

74.        Confidential Allstate Insured No. 5 suffered a fire loss to her home and personal property in Queens, New York.  Allstate paid a portion of the claim but refused to honor its replacement cost coverage because the insured was unable to complete replacement within 180 days of the actual cash value payment.   It took a month to receive initial funds from the mortgagee who was named on the ACV check and another month for a building permit to be received.  Construction took longer than four months and ACV money paid for contents damage was used to complete rebuilding, making contents replacement within 180 days impossible.

75.        Confidential Allstate Insureds No. 6 suffered a fire loss to their home and personal property in Suffolk County, New York.  Allstate paid a portion of the loss but refused to pay replacement cost benefits because the insured could not complete repairs within the replacement period of 180 days.  It took approximately 180 days to obtain building permits in order to repair the damaged property after the payment of the ACV making it impossible for the insureds to "complete" repair within 180 days.

76.        There are thousands of such victims.

77.        Allstate promised these various insureds and other Class members that they were "in good hands" and would receive "fast and fair claims service."  Upon the occurrence of these various insured losses, these various Class members learned they were not in "good hands" and received neither "fast" service nor "fair" service.

## COUNT I

### By Plaintiffs Individually And On Behalf Of The Class For Breach Of Contract

78.        Plaintiffs repeat and reallege each paragraph of this Complaint as if more fully set forth at length herein.

79.        Defendant issued policies of insurance to plaintiffs and Class members which by their terms promised to conform, in their entirely, to the statutes of the state in which the residence premises is located even if policy provisions conflict with the statutes of that state.

80.        Allstate's policies at issue herein conflict with the law in New York which mandates all insurers insuring premises within the state to provide coverage no less favorable than the 165 lines (or the applicable state analogue for states other than New York).

81.        Notwithstanding this conflict, Allstate has not, as required by the contracts of insurance issued to insureds, amended the provisions of its policies to conform to the statutes of the New York State Insurance Law which mandate that all coverage insuring real and personal property within the state of New York "be no less favorable" than that provided by the 165 lines.

82.        Allstate's conduct in issuing policies whose terms conflict with applicable state law and its conduct in adjusting and paying losses in conformity with its interpretation that the insured must "complete" repair or replacement of damaged, insured property within 180 days of an arbitrary date selected by Allstate as a condition of qualifying for the replacement cost coverage and extended limits proceeds constitutes a breach of the contract of insurance.

83.         The new policy language (described in paragraph 31 above) has been interpreted by Allstate to require that the Plaintiffs and other Class members COMPLETE all repairs and/or replacement of all property within 180 days of Allstate's payment of the Actual Cash Value loss, as opposed to the prior language which required that Plaintiffs needed only to "make claim" for the benefit of replacement cost coverage within the 180 days from the date of loss and did not require the insured to even begin repairs in order to later access the holdback pursuant to the replacement cost coverage once repairs were made.

84.         The relevant policy language, as quoted hereinabove, does not, by its terms, require "completion" of repairs, replacement or rebuilding.

85.         At the least, said language is ambiguous entitling Plaintiffs and Class members to enforce their interpretation.

86.         Plaintiffs and Class members have incurred consequential losses, consisting of litigation costs and attorney's fees for collecting the building and personal contents portions of their claim as well as incurring additional living expenses, interest costs, etc. as a result of the conduct alleged.

87.         The parties to this policy necessarily knew and should have known that a breach of the contract by Allstate would necessarily cause Plaintiffs and Class members to incur further losses including, but not limited to, legal fees and litigation expenses, interest, costs and further additional living expenses as a consequence of its breach.

88.         Plaintiffs have incurred fees and expenses which diminished their recovery herein, resulting in these insureds not being made whole, directly as a result of Allstate's breach of its contract which expenses were reasonably within the contemplation of the parties when the policy was issued.

89.         Allstate has breached the covenant of good faith and fair dealing that is implicit in the contract of insurance between Plaintiffs and Class members and Allstate, by not handling and adjusting Plaintiffs' claim in good faith as herein alleged.

90.         Allstate has breached the covenant of good faith and fair dealing that is implicit in the contract of insurance between Plaintiffs, Class members and Allstate, by failing to pay for the covered claims as required, as heretofore stated.

91.         Allstate has breached the covenant of good faith and fair dealing that is implicit in the contract of the insurance between Plaintiffs and Defendant by its conduct as alleged herein.

92.         Allstate's refusal to pay full replacement cost or the holdback and extended limits coverage unless the repairs and replacement were COMPLETED is itself a breach of the new language even if the new language had been approved by the Insurance Department.  As a direct result of Allstate's breach of its contracts of insurance, Plaintiffs and members of the Class have suffered loss and damage in an amount to be proven at trial.

93.         The breach of contract and the bad faith conduct of Allstate, described herein is a proximate cause of the consequential damages suffered by the Plaintiffs and Class members.

94.         As a result of the foregoing, Plaintiffs and the Class have sustained damages, including consequential damages, in an amount to be determined.

## COUNT II

### By Plaintiffs Individually And On Behalf Of
### The Class Against Defendants For Declaratory Judgment

95.         Plaintiffs, on behalf of themselves and the Class, reallege and incorporate by reference each and every paragraph as if they were set forth again herein.

96.         During the Class Period, Allstate required  its insureds to complete repairs within 180 days of the payment of the Actual Cash Value loss as a condition for qualifying for any payment in excess of the Actual Cash Value of the damaged property  or the extended limits benefits.

97.         Plaintiffs and Class members who have not yet received their Replacement Value payouts or extended benefits for covered losses to covered property have been made aware by Allstate that Allstate will only pay replacement cost coverage if the insured has actually completed repair or replacement of the insured damage property for which claim has been made within the replacement period of 180 days.

98.         As a result of the foregoing there is an actual dispute over the extent of coverage Allstate will provide under the contracts of insurance sold by Allstate to its insureds.

99.         Plaintiffs therefore seek a declaration of their rights under the policies of insurance they purchased from Allstate declaring that an insured who has suffered covered loss to covered property does not need to complete repair or replacement of the damaged property within 180 days of payment of the Actual Cash Value payment in order to subsequently be entitled to the benefits of the replacement cost coverage or the extended limits endorsement.

## COUNT III

### By Plaintiffs Individually And On Behalf Of The Subclass For Breach Of The Loss Settlement Contract To Settle Claims According To the Terms Of The Policies And New York State Insurance Law.

100.        Plaintiffs repeat and reallege each paragraph of this Complaint as is more fully set forth at length herein.

101.        When the Plaintiffs and other Class members entered into an agreement with Allstate that resulted in the payment to the insured of the Actual Cash Value of the damaged property, that agreement constituted a contract separate and distinct from, the insurance policy contract.  That distinct contract is premised upon the terms of the policy including expressed and implied terms of an obligation and undertaking by Allstate to pay the insured the repair or replacement cost holdback for the damaged property according to the language of the policy and insurance laws of the state of New York and conforming terms and conditions of the insurance policy, as well as the extended limits benefits.

102.        Notwithstanding this separate and distinct contractual obligation, Allstate, in adjusting losses, after the settlement agreement had been entered into, required the insured to COMPLETELY repair or replace damaged property as a condition of obtaining the replacement cost coverage holdback proceeds and/or the extended limits benefits and constitutes a breach of the settlement contract.

103.        As a direct result of Allstate's breach of its settlement contracts, Plaintiffs and members of the Class have suffered loss and damage in an amount to be proven at trial.

## COUNT IV

### By Plaintiffs Individually And On Behalf Of The Class For Fraud

104.         Plaintiffs repeat and reallege each and every paragraph as if more fully set forth herein.

105.         Allstate is in exclusive possession of facts regarding its own scienter and details regarding the "who, what, when, where and how" of the fraudulent scheme described herein in this Count and at Subsections A and B of the "substantive Allegations " section herein.

106.         The coverage for replacement cost and the "recoverable depreciation" to which Allstate's insureds, including plaintiffs and members of the Class, are entitled is an explicit term of the polices of insurance that Allstate markets and sells to insureds.

107.         The coverage for extended limits of up to 25 percent beyond the stated policy limit known as the "Building Structure Extended Limits Endorsement" is an explicit term of the policy that Allstate markets and sells to Class members for an additional premium.

108.         Allstate knows and understands that its policies of insurance must conform to the laws, rules and regulations of the states in which the residences and buildings it insures are located.  Allstate's Deluxe Plus Policy explicitly promises that its policy terms and provisions will be amended to conform to any applicable law, rules and regulations of the state in which the insured premises are located.

109.         Allstate knows that the policies of insurance it issues in the State of New York must conform to the 165 lines and provide to its insureds within the state of New York coverage "no less favorable" than the coverage afforded under the 165 lines.

110.        Allstate knows that it has been interpreting its replacement cost policy language, and adjusting covered losses on covered property, in a way that is contrary to the Insurance law of New York and its 165 lines which requires that coverage be no less favorable to the insured than the 165 lines. It knows that because it has been meeting and speaking with officials of the New York State Department of Insurance and discussing these issues and has been informed that Allstate's policies and practices are not consistent with the way that other insurers issuing replacement value policies in the State of New York have interpreted the required policy language and adjusted covered losses to covered property under the applicable New York State Insurance Laws.

111.        Allstate has intentionally decided to require insureds to complete repair or replacement of their damaged property within 180 days of the date Allstate, by itself, decides to issue a payment based on Actual Cash Value. Allstate's decision to implement such practices are part of its plan to increase profits by "redefining its benefits and payment approach". Allstate knows and understands that its practices are in violation of the laws of the State of New York and the express language of the policies.

112.        Allstate knows that its practices and interpretation of the policy language (which is ambiguous at a minimum) requiring insureds to "complete" repair, rebuilding and replacement deprives the insured of the full benefits of the coverage that the insured is paying for and entitled to as a matter of the language of the policy and the laws of the state of New York.

113.        Allstate intentionally sells its policies of insurance promising to amend policy terms to conform to applicable laws of the state in which the insured premises are

located but Allstate knows that it has no intention of providing the benefits of the coverage to the insureds who purchase such policies.

114.     Allstate has intentionally engaged in deceptive acts in seeking the NYSID "approval" of its policy language as set forth herein in order to further its scheme to deceive insureds to deprive them of their replacement cost coverage benefits.

115.     Allstate's acts of marketing and selling policies with replacement and extended benefits coverage terms and provisions that Allstate has no intention of ever honoring are willful, deliberate and done with full knowledge and intention that Allstate will not fulfill the contractual terms of its coverage.

116.     Plaintiffs and members of the Class have been injured as a result of the fraud as policyholders have been deprived of coverage for losses to covered property from covered perils.

117.     Allstate has published and marketed false advertising of its replacement and extended benefits endorsements that fail to advise the consuming public including Plaintiffs and Class members of the differences between Allstate's non-conforming language and the conforming language utilized by every other insurer in the market place. (See Exhibit "B")

118.     Allstate refuses as a regular business practice to allow consumers seeking to purchase its product to see the policy language being purchased until significantly after the purchase is consummated and premiums paid.  This effectively prevents consumers from making an informed and knowledgeable choice and is part and parcel of Allstate's fraud and deception.

119.        As a result of the foregoing Allstate has committed and been involved in

a fraud upon its policyholders.

120.        Plaintiffs and other Class members have justifiably relied on Allstate's

false and misleading statements, advertising, marketing, policy languages and other

misrepresentations.

121.        Plaintiffs seek compensatory and punitive damages for Allstate's

fraudulent acts and practices.

## COUNT V

### On Behalf of Plaintiffs and the Class for Monetary Damages for
### Breaches of Fiduciary Duty

122.        Plaintiffs repeat and reallged the allegations contained in the foregoing

paragraphs of this Complaint as if fully set forth herein.

123.        Plaintiffs bring this Count on behalf of themselves and the Class.

124.        Due to the nature of the relationship created by Allstate's actions which

included:

–        Informing insureds that they are in "good hands" and can

repose trust in Allstate

–        Preventing insureds from reading or understanding the policy

language in question prior to purchase.

–        Maintaining superior knowledge of its policy language and

practices mandating that its customers rely on and trust that

superior knowledge in purchasing the coverage and in having

peace of mind that in the event of a covered loss, they would

recover replacement value and extended limit benefits as purchased.

– Promising its insureds it would conform its contract to statutory protections afforded its insureds and then failing to bring those protections to the attention of its customers utilizing its superior knowledge

125.     At all relevant times, Defendant Allstate assumed upon itself, the role of "fiduciary" with respect to the adjustment of the insured's losses.

126.     As a result of Allstate's pattern and practice of breaching their obligations under the polices by adjusting losses in a manner deliberately calculated to justify depriving the insured of the benefits of the replacement cost coverage, the Holdback and/or the extended limits endorsement, plaintiffs and Class members have been deprived and cheated of hundreds of millions of dollars of coverage which they paid for and which was part of the property damage coverage sold by Allstate to plaintiffs and Class members.

127.     As a direct and proximate result of these acts and omissions, the Plaintiffs and other insured suffered losses.

128.     Plaintiffs, on behalf of themselves and the Class, pray for relief compelling the Defendant to make restitution and/or make good the losses.  Further, Plaintiffs seek the disgorgement of any profits obtained by Defendant as a result of their violations.

## COUNT VI

### On Behalf Of Plaintiffs And The Class Under
### Section 349 of New York's General Business Law

129.     Plaintiffs repeat, reiterate and reallege each and ever allegation contained in the previous paragraphs, as if more fully and completely set forth at length herein.

130.     Defendant has engaged in misleading and deceptive conduct as detailed above and by denying Plaintiffs' specified claims without basis.

131.     As a result of Defendant's misleading and deceptive conduct as detailed above, Plaintiffs have had to institute this action in order to obtain payment for their claim.

132.     The misleading, egregious and deceptive actions of Allstate, toward Plaintiffs and class members, in refusing to process and pay Plaintiffs' claims for replacement cost and extended limits benefits promptly, constitute deceptive business acts and practices, as prescribed by Section 349 of the General Business Law of the State of New York.

133.     Defendant's policy is a standard form policy issued to thousands of homeowners similarly situated in New York State and Defendant's conduct as complained of is of a nature that has been repeated many times and likely will continue in the future. Accordingly, Allstate's behavior has been directed to, and has affected, consumers and the public at large in New York.

134.     As a result of the actions complained of, Plaintiffs and the Class members are entitled to treble damages up to $1,000, plus reasonable attorneys' fees.

## COUNT VII

**On Behalf Of Plaintiffs And The Class For Recission of Policies Sold By Allstate (Under Which The Insured Class Member Has Never Been Paid For any Claims) And Return of All Premiums Based Upon Allstate's Issuance And Sale Of Policies Of Insurance In New York Which Were Not Knowingly Approved By The New York State Insurance Department And/Or Which Violate New York Insurance Law And/Or Which Purported to Provide Replacement Cost Coverage**

135.      Plaintiffs repeat and reallege each allegation above on behalf of the Class consisting of Sub-Class members who purchased policies of insurance from Allstate insuring property within the State of New York during the Class Period but who did not suffer a covered loss during the Policy Period for which Allstate paid any insurance proceeds

136.      While Allstate purports to be interpreting the pertinent policy language according to its written terms and conditions, that interpretation and the policy language itself violate the laws of New York, specifically, Insurance Law Section 3404 which prohibits the sale of policies if the policies' terms are less favorable to the insured than the terms of the "standard fire insurance policy of the state of New York" as set forth in New York in Article 34, Section 3404, Chapter 28 McKinney's Consolidated Law of New York Annotated.

137.      The coverage provided by the 165 lines is more extensive and favorable to the insured than the coverage provided by Allstate's standard property damage coverage forms including the Deluxe Policy. Allstate's policy terms and practices and its interpretation thereof along with its adjustment and loss paying practices for policies of insurance issued in the state of New York afforded to insureds "less favorable coverage" than offered under New York's Standard Fire Insurance Policy. This violated New York insurance law that requires all such coverage in New York to afford no less favorable coverage than offered under the Standard Fire Insurance Policy.

138.      The New York State Insurance Department never knowingly approved Allstate's right to sell the policies containing the 180 day limit in the state of New York.

139.      Allstate sold policies of insurance that did not contain any requirement that repairs or replacement be "COMPLETED" within 180 days.  Nonetheless when Allstate sold the policies to insureds it knew that it intended, and its practice had been, to require COMPLETION of all repairs and replacement as a condition of qualifying for the replacement cost coverage and/or the holdback and/or extended limits coverage.

140.      Accordingly, plaintiffs, Class members and Sub-Class members have been sold illusory coverage at a price far above the value of the coverage actually provided.

141.      Defendant is liable to Plaintiffs, Class and Sub-Class members for a pro rata refund of the premiums allocable to the fair value of the replacement coverage which plaintiffs paid but which Allstate has refused to provide to them and which Allstate never had any intention of providing to plaintiffs except under circumstances that were practically impossible to occur and which defeated and frustrated the coverage for which Plaintiffs, Class members and Sub-Class members  paid.

142.      Plaintiffs, Class and Sub-Class members are therefore entitled to a refund.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

1.      That this action be certified as a Class action on behalf of the proposed Class defined in this Complaint;

2.      That the named Plaintiffs be designated as the representative of the Class, and that named counsel be designated as Class counsel;

3.      That Plaintiffs and the Class have judgment against defendants on all Counts I-VII and that Plaintiffs recover all allowable damages from Defendants under each Count, with interest thereon;

4.      That declaratory judgment be entered in favor of the Plaintiffs and the Class as sought herein;

5.      That Plaintiffs and the Class be awarded punitive damages in an amount of at least $1,000,000,000.00 (One Billion Dollars)

6.      That the costs of this action be taxed to Defendant;

7.      That Plaintiffs and the Class be awarded attorneys fees and other costs of the litigation;

8.      For such other and further relief as to this Court deems just, fair and reasonable.

Dated: New York, New York
       July 23, 2010

                                WILKOFSKY, FRIEDMAN,
                                KAREL & CUMMINS

                        By:     _____
                                JONATHAN J. WILKOFSKY
                                MARK FRIEDMAN
                                Attorneys for Plaintiffs
                                299 Broadway, Suite 1700
                                New York, New York 10007
                                (212) 285-0510

                                SQUITIERI & FEARON, LLP

                        By:     /s/ Lee Squitieri
                                LEE SQUITIERI
                                GARRY T. STEVENS, JR.
                                Attorneys for Plaintiffs
                                32 East 57th Street
                                New York, New York 10022
                                (212) 421-6492